In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-2049

O.B. *et al.*, individually and on behalf of a class,

*Plaintiffs-Appellees*,

*v.*

FELICIA F. NORWOOD, in her official capacity as Director of the Illinois Department of Healthcare and Family Services,

*Defendant-Appellant*.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.
No. 15 C 10463 — **Charles P. Kocoras**, *Judge*.

ARGUED SEPTEMBER 7, 2016 — DECIDED SEPTEMBER 23, 2016

Before WOOD, *Chief Judge*, and POSNER and EASTERBROOK, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal by the Illinois Department of Healthcare and Family Services ("HFS") (Norwood, the nominal defendant-appellant, is sued only in her official capacity as the department's director) challenges Judge Kocoras's grant of a preliminary injunction. The appeal requires us to interpret provisions of the Medicaid Act, with

which Illinois as a participant in Medicaid is required to comply; HFS is the agency charged with carrying out the state's duty of compliance.

The Act defines "medical assistance" as including "early and periodic screening, diagnostic, and treatment services [EPSDT] … for individuals … under the age of 21" (to simplify we'll refer to all such persons as "children"), 42 U.S.C. § 1396d(a)(4)(B), and requires the state to "mak[e] medical assistance available" to all eligible individuals. § 1396a(a)(10)(A). A related provision, § 1396a(a)(43)(C), requires the state to "provide for … arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services." (Corrective "treatment" is "T" in the acronym "EPSDT.") Another provision, 42 U.S.C. § 1396a(a)(8), requires that medical assistance "shall be furnished with reasonable promptness to all eligible individuals."

One of the EPSDT treatment services is "private duty nursing services," 42 U.S.C. § 1396d(a)(8), which we'll abbreviate as "home nursing"; it means that the child lives at home rather than in a hospital or other medical-care facility and is attended by a nurse or series of nurses for the number of hours allowed by HFS, which pays the nurses at rates determined by the agency.

The children whom HFS approves for home nursing tend to be in very poor health; we can take O.B., the first named plaintiff, as representative and so the only class member we need discuss. He is two years old, enrolled in Medicaid, approved by HFS for home nursing, and diagnosed with Down Syndrome, lung disease, and cardiac abnormalities. Ventila-

tor-dependent for breathing, he also cannot digest normally or take any of the oral nutrition supplements designed to help people who have difficulty digesting to get nourishment.

At the age of nine months he'd been hospitalized in Peoria for respiratory failure, and while he was there HFS approved a $19,718 monthly budget to pay nurses for up to 18 hours a day to take care of him at home. But when he was ready to be sent home to receive the home-nursing care that had been prescribed for him, his parents had first to arrange for that care. For while HFS had approved and agreed to pay for it up to the budgetary limit specified, it had left it to the parents to find the nurses, which they couldn't do before they knew when their son would be ready to be released by the hospital—and it wasn't safe for him to leave the hospital until his parents hired the nurses needed to take care of him at home. It took the parents almost a year to obtain an adequate home-nursing staff, and only then was O.B. sent home.

The suit charges HFS with violating the Medicaid statute by failing to arrange for (or even, so far as appears, attempting to arrange for), with the requisite reasonable promptness, for home nursing to which it acknowledges O.B. and the other class members are entitled by the Medicaid Act.

The district judge certified a class consisting of Illinois children who have been approved for home nursing but whose parents or guardians haven't been able to hire nurses for the hours of nursing to which the state entitles the parents or guardians. And convinced that there is a high likelihood of the plaintiffs' succeeding at trial in proving HFS's statutory violation, the judge issued a preliminary injunction (which is the ruling that the state is appealing). The essential

provision of the injunction requires defendant Norwood (which is to say HFS) to "take immediate and affirmative steps to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment of in-home shift nursing services to Plaintiffs and such similarly situated Medicaid-eligible children under the age of 21 in the State of Illinois who also have been approved for in-home shift nursing services, but who are not receiving [those] services at the level approved by [HFS], as required by the Medicaid Act." Although the state claims that the injunction is too vague to be enforceable, the order granting the injunction gave reasons for it, stated its terms, and described in "reasonable detail" the "acts … required" by the state, and thus complied with FRCP 65(d)(1) (also (d)(2), but that is not contested by the state). All it tells the state to do is take prompt measures to obtain home nursing for the class members, and that is a reasonably clear directive.

Remember that although O.B. had been approved for home nursing for which HFS had agreed to pay, he was denied it for almost a year because HFS, so far as it appears, made no attempt to find nurses for him. That left the search to be conducted by parents who apparently lacked the knowledge or experience required to hire the needed number of nurses without a painfully protracted search.

The plaintiffs seek a permanent injunction, and a trial will be required to determine whether they're entitled to it. But Judge Kocoras was on solid ground in predicting, as the basis for granting the preliminary injunction sought by the plaintiffs, that they are likely to prevail at trial. Certainly the defenses thus far advanced by HFS are weak. The primary defense is that nothing in the Medicaid statute "required

[HFS] to ensure that Plaintiffs would receive medical care from nurses in their homes." But it was HFS that decided that home nursing was the proper treatment for O.B., the other named plaintiffs, and the other members of the class.

Apparently it's not easy to find nurses for children with health problems as serious as those of O.B. and the other members of the class, for HFS does not criticize O.B.'s parents for the time it took them to find nurses for their child. Adding to the difficulty is the fact that most, maybe all, of the parents of the plaintiff children and of the other members of the class are poor. For with rare exceptions a child is eligible for Medicaid in Illinois only if his or her family income exceeds the federal poverty line by no more than 42 percent. See Center for Medicare & Medicaid Services, *Medicaid & CHIP in Illinois*, https://www.medicaid.gov/medicaid-chip-program-information/by-state/stateprofile.html?state=illinois (visited Sept. 12, 2016, as were the other websites cited in this opinion). For a household of four persons the ceiling is $34,506—a very modest income for a household of that size. See U.S. Dep't of Health & Human Services, *Poverty Guidelines 01/25/2016*, https://aspe.hhs.gov/poverty-guidelines. And some, maybe many—we're not told how many—members of the class live in southern Illinois, which is the poorest region in the state and has the fewest nurses per capita. See Illinois Center for Nursing, "Registered Nurse Workforce Survey 2014" 17–18 (December 2014), http://nursing.illinois.gov/PDF/2015-05-04_icn_rnws2014_report.pdf; "Licensed Practical Nurse Workforce Survey Report 2015" 16–17 (March 2016), http://nursing.illinois.gov/PDF/2016-03-09_ICN_LPN_2015_Survey_Report_Final.pdf.

One might think that hospital personnel would be able to advise parents of patients such as O.B. where to find nurses able and willing to provide the required care for the children at HFS's payment ceiling. But there is no indication of this. HFS delegates the coordination of the care necessary for children like O.B. to the Division of Specialized Care for Children (DSCC) of the University of Illinois at Chicago, see http://dscc.uic.edu/, which "help[s] children and youth with special healthcare needs connect to services and resources." But there is no indication that when as in O.B.'s case adequate nursing staff is not within the easy reach of the parents of children entitled to home nursing, HFS, whether by itself or in conjunction with UIC, assists the parents in their search. As far as the record shows or we are able to determine, the hospitals from which children like O.B. are to be sent home to receive home nursing do not participate in the search for nurses. And because many nursing agencies do not offer pediatric home nursing and most private insurance doesn't cover such service, few hospitals may be able to help parents find home nursing for their children. See American Academy of Pediatrics, "Policy Statement: Financing of Pediatric Home Health Care," 118 *Pediatrics* 834 (2006), http://pediatrics.aappublications.org/content/118/2/834.long.

HFS doesn't argue that home nursing is inappropriate for O.B. or any other member of the class; it couldn't argue that, because it decided it *was* appropriate for him (and the others). As far as we can glean from the sparse record, HFS has given up on searching (if it ever did) for nurses for children whom the agency deems entitled to home nursing. It's left the search to parents many or even most of whom may not be competent to conduct a timely and effective search for multiple nurses (no nurse is going to work 18 hours a day,

day in and day out). If this is true, as Judge Kocoras found, HFS has violated the Medicaid Act.

The state argues that "if nurses are not able to fully staff [the plaintiffs'] hours [presumably the reference is to the hours that HFS has agreed to pay for], Plaintiffs can receive care elsewhere at the State's expense." The "elsewhere" probably means hospitals. But it's the *state* that decided that home nursing was right for the plaintiffs' children. So far as appears, the only alternative would be the indefinite confinement of O.B. and the other class members in hospitals. The state has yet to provide any evidence that alternatives to home nursing, such as hospitalization, are adequate to the children's needs. It argues that HFS "simply cannot guarantee that enough nurses will be available to care for Plaintiffs in their homes," which is doubtless true. But the plaintiffs aren't asking for a guarantee; they're asking for the nurses, and there is no indication that HFS will (unless compelled by the courts) lift a finger to find nurses to provide home nursing for children in O.B.'s situation. Indeed HFS denies having any obligation to do so. It argues that the preliminary injunction "improperly asserts that [HFS] should take affirmative steps to provide in-home nursing care, without identifying those steps or acknowledging the many steps already taken, and includes erroneous assumptions about what the Medicaid Act requires." But surely HFS knows what those "affirmative steps" are—that is implicit in its claim to have taken many steps already. In asking the plaintiffs to tell it what those steps are, the state is asking the plaintiffs to substitute themselves for HFS. And the preliminary injunction should be understood simply as a first cut: as insisting that the state do *something* rather than nothing to provide in-home nursing care for these children. The ade-

quacy of what it does can then be evaluated, perhaps leading to modification or even abrogation of the preliminary injunction.

The state's reference to "many steps already taken" is unsubstantiated in its briefs, and its reference to "erroneous assumptions" is a misunderstanding of the law, as we'll show. But we want first to note that the state has not told us what "steps" it has taken to provide in-home nursing care for children with the afflictions involved in this case. Has it made active efforts to recruit nurses for such children? There is no indication that it has, and certainly no evidence. It hasn't told us how many nurses (if any) it has *ever* recruited to provide home nursing care for afflicted children, or even how many nurses there are in Illinois (163,000, according to The Henry J. Kaiser Family Foundation, *State Health Facts*, "Total Number of Professionally Active Nurses," April 2016, http://kff.org/other/state-indicator/total-registered-nurses/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D). Nor are we told how many nurses in other states might be recruited at reasonable cost to provide care for the children of the plaintiffs and other class members, should it be difficult to recruit Illinois nurses.

This is not to suggest that the district court could order nurses to be removed from positions caring for other people and transferred to the homes of the members of the plaintiff class. The state argues that there is a nurse shortage in Illinois, and implicitly that there is nothing the state can do about it; and this may be true. (And if the shortage is of nurses willing to work at the reimbursement rates set by HFS, we could not order the agency to eliminate the short-

age by raising those rates. *Armstrong v. Exceptional Child Center*, 135 S. Ct. 1378, 1385 (2015). But the nurse-shortage argument was not made in the district court until after the preliminary injunction was issued, and while repeated in the state's briefs in this court no particulars are offered and no supporting evidence cited. The reason appears to be the state's "erroneous assumptions" argument, which is that all that Medicaid requires of a participating state is *payment* for medical services, not the services themselves; that while the statute requires the state and hence HFS to "mak[e] medical assistance available" to the plaintiffs, 42 U.S.C. § 1396a(a)(10)(A), "medical assistance" just means either the provision of "the care and services" needed by the patient *or* the "payment of part or all of [their] cost." § 1396d(a). In other words, the state argues that it gets to choose whether to pay for services or to provide services, though of course if it fails to provide services and no one fills the gap, it won't have to pay either.

But in giving two meanings to "medical assistance" the statute need not be read to authorize HFS to decide which meaning shall govern in each case. In fact the statute can't be read so, because, for example, it states that a "State plan for medical assistance *must provide for* … arranging for (directly or through referral to appropriate agencies, organizations, or individuals) *corrective treatment* the need for which is disclosed by such child health screening services." § 1396a(a)(43)(C) (emphases added). See, e.g., *Katie A. ex rel. Ludin v. L.A. County*, 481 F.3d 1150, 1158–59 (9th Cir. 2007), and cases cited there; see also Centers for Medicare and Medicaid Services, *State Medicaid Manual*, chs. 4 and 5, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html?DL

Page=1&DLEntries=10&DLSort=0&DLSortDir=ascending).
And remember that the Medicaid Act requires the state to
provide the required services with reasonable promptness.

In arguing that all the Act requires of HFS is financial
contribution, HFS relies on *Bruggeman ex rel. Bruggeman v.
Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003), which called
"Medicaid … a payment scheme, not a scheme for state-
provided medical assistance." At that time the statute de-
fined "medical assistance" only as "payment of part or all of
the costs of" enumerated care. 42 U.S.C. § 1396d(a) (2009).
But Congress amended this definition by the Patient Protec-
tion and Affordable Care Act in response to *Bruggeman* and
the decisions that followed it. And as explained in *A.H.R. v.
Washington State Health Care Authority*, 2016 WL 98513, at *12
(W.D. Wash. Jan. 7, 2016) (internal quotation marks omitted),
by doing this "Congress intended to clarify that where the
Medicaid Act refers to the provision of services, a participat-
ing State is required to provide (or ensure the provision of)
services, not merely to pay for them."

We note a final oddity in HFS's appeal. The state was
willing to pay $19,178 a month for home nursing services for
O.B. (at the estimated requirement of 18 hours of nursing
service per day, equal to 540 hours per month, the average
hourly cost would be $35.51). But O.B.'s hospitalization cost
the state roughly $78,000 a month—four times the expense of
home nursing. And surely HFS could scour the state for
nurses willing to work for $35.51 an hour (not a bad wage—
it equates to an annual wage of $71,020 a year for a nurse
who works 2000 hours a year) more rapidly and efficiently
and productively than the parents of these unfortunate chil-
dren. HFS does not remark this anomaly in its briefs.

The district judge's grant of the preliminary injunction is

AFFIRMED.

EASTERBROOK, *Circuit Judge*, concurring. Although I join the court's opinion, I remain concerned by the language of the district court's injunction.

The injunction requires Director Norwood to "take immediate and affirmative steps to arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment of in-home shift nursing services to Plaintiffs and such similarly situated Medicaid-eligible children under the age of 21 in the State of Illinois who also have been approved for in-home shift nursing services, but who are not receiving in-home shift nursing services at the level approved by Defendant, as required by the Medicaid Act." What steps, in particular? The injunction does not say. Yet Fed. R. Civ. P. 65(d)(1)(C) tells us that an injunction must "describe in reasonable detail … the act or acts restrained or required." This injunction does not supply *any* detail. The Supreme Court has reversed injunctions that read like this one. See, e.g., *Schmidt v. Lessard*, 414 U.S. 473 (1974).

Some of the district court's opinion suggests that the judge thought particulars unnecessary because the goal is to produce a defined result: children get the nursing services authorized for them. Since the Department of Healthcare and Family Services knows the desired end, the judge implied, it must know the means to produce that end.

That is a non-sequitur. If as the Department asserts there is a shortage of nurses, then the end cannot be achieved without taking medical care away from other deserving persons, and the district judge did not suggest that rationing of nursing care is either required by the Medicaid Act or an appropriate use of the court's equitable powers. Raising reimbursement rates might induce nurses to supply additional services,

but *Armstrong v. Exceptional Child Center*, 135 S. Ct. 1378 (2015), holds that judges cannot change reimbursement rates in private suits. Yet if the judge cannot command Illinois to pay more money, it may not be possible to achieve the end that the judge thought required by the statute.

The injunction in a case of this kind should be designed to specify those steps (other than raising promised rates of payment) that the Department must take in order to find nurses for the plaintiff class—if, as class counsel believe, there are nurses to be found. The principal problem with drafting such an injunction is one my colleagues mention: we do not know what will work. We shouldn't expect class counsel to have this knowledge; lawyers are not professional healthcare administrators. Nor should we expect the judge to know what the Department ought to do. The Department itself may not know what will suffice; it is so committed to the idea that all it need do is offer to pay for services that it may never have tried any other approach.

Perhaps a declaratory judgment would have been a better starting point, but the Department is not complaining about the use of an injunction rather than a declaratory judgment. All a district court can do in a situation such as this is require the defendant to start trying. Rule 65(d) requires "reasonable" detail, not more detail than is possible under the circumstances. Last May the Department sent the judge a letter with a list of some options it could pursue. As long as the Department starts working through this list, or takes some other step that seems to have a prospect of success, it has complied with the injunction. It would be out of the question for the district court to hold the Department in contempt for trying one or

more approaches that turn out poorly. As long as the injunction is detail-free, the most the judge can demand is that the Department do *something*—and if the first one or two somethings fails, try something else.

The district judge should keep tabs on what is happening and adjust the injunction as appropriate. If the Department turns out to be right about the supply of nurses, the judge also must ensure that the interests of other persons, competing with the class for scarce resources, are adequately protected. Not unless the Department defies a command far more specific than the one issued so far would be it permissible (or sensible) to consider taking punitive steps.