In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 16-3655 & 16-3968

BT BOURBONNAIS CARE, LLC, *et al.*,

*Plaintiffs-Appellees*,

*v.*

FELICIA F. NORWOOD, Director, Illinois Department
of Healthcare and Family Services,

*Defendant-Appellant*.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 5765 — **Milton I. Shadur**, *Judge*.

———————————

ARGUED APRIL 26, 2017 — DECIDED AUGUST 8, 2017

———————————

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit
Judges*.

WOOD, *Chief Judge*. This case represents an effort by ten
operators of nursing homes in Illinois to be paid what they
believe they are owed. Providers that depend on Medicaid
funding must go through an administrative process in which
their reimbursement rate is calculated. The plaintiffs contend
that their rates were not properly adjusted after a change in

ownership of the nursing homes they run. Before that issue can be resolved, however, there are two significant hurdles plaintiffs must clear: first, they must show that they have a private right of action for a violation of the relevant part of the Medicaid statute, 42 U.S.C. § 1396a(a)(13)(A); and, second, they must show that the Eleventh Amendment does not categorically bar this case from going forward.

**I**

Our plaintiffs are ten operators of long-term care facilities, generally called nursing homes, located in Illinois. For ease of exposition, we'll call them the Operators. In 2012 each of them purchased existing nursing homes and took over all operations and services. Each Operator obtained a new license from the state and a new Medicare provider number from the federal government; the old licenses and Medicare numbers were retired. Most of the residents in the affected nursing homes qualify for Medicaid assistance. Through the Illinois Department of Healthcare and Family Services (IDHFS), the state administers the Medicaid funds in accordance with a complex array of federal statutes and regulations. See 42 U.S.C. §§ 1396 to 1396w-5; *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990); *Bontrager v. Indiana Family & Soc. Servs. Admin.*, 697 F.3d 604, 605 (7th Cir. 2012). IDHFS reimburses nursing homes for Medicaid-eligible expenses on a per diem basis, but the rate itself must be calculated annually based on the costs of running the facility. ILL. ADMIN. CODE tit. 89, § 140.561-3. When ownership of a home changes, state law requires IDHFS to calculate a new rate based on the new owner's report of the costs it has accrued during at least the first six months of operation. *Id.* § 140.560(a).

The Medicaid Act, 42 U.S.C. § 1396a, requires states to use a public process, complete with notice and an opportunity to comment, when it determines payment rates. The relevant language of the statute reads as follows:

(a) … .

A State plan for medical assistance must—

… .

(13) provide—

> (A) for a public process for determination of rates of payment under the plan for … nursing facility services, … under which—
>
>> (i)     proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,
>>
>> (ii)    providers, beneficiaries and their representatives, and other concerned State residents, are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,
>>
>> (iii)   final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published … .
>>
>>> … .

42 U.S.C. § 1396a(a)(13)(A). At issue in this case are the questions whether these requirements are enforceable by parties

such as the Operators and, if so, whether the Director of
IDHFS complied with them.

In this suit, filed in 2016, the Operators contend that
IDHFS has violated—and is still violating—section
1396a(a)(13)(A) by failing to recalculate their reimbursement
rates in the wake of the 2012 change in ownership. The Direc-
tor (whom they have sued in her official capacity) failed, they
say, to provide an adequate notice-and-comment process, and
IDHFS also allegedly failed to comply with the provisions of
the Illinois state plan requiring a recalculation of rates after a
change of ownership, see ILL. ADMIN. CODE tit. 89,
§ 140.560(a). The Operators' theory is that this failure to com-
ply with the state plan itself violates the *federal* law. They as-
sert that the recalculation process never began, and so there
was never any notice, never any chance to comment, and ob-
viously in the end never any revised rates. The Operators con-
tend that the state's laxness in these respects has cost them
$12 million in unreimbursed costs. They asked for a declara-
tion that their rights have been violated by the Director's re-
fusal to provide a public process and a limited injunction "ret-
roactive to July 1, 2012," ordering that such a process take
place. They also asked that the Director be compelled to pub-
lish the methodology and justifications supporting IDHFS's
refusal to treat the Operators as new owners, and they want
an opportunity to comment on whatever the Director says. Fi-
nally, and most controversially, they asked for an injunction
"retroactive to July 1, 2013," requiring IDHFS to "establish
and process the appropriate reimbursement rate(s)."

The Director filed a motion to dismiss under Federal Rule
of Civil Procedure 12(b)(6); she argued that section

1396a(a)(13)(A) does not support a private right of action under 42 U.S.C. § 1983, and that to the extent the suit seeks money from the state, the Eleventh Amendment bars it. Her motion did not distinguish between a substantive right to adequate payment and a procedural right to notice and comment. She argued only that, as a result of a 1997 amendment to the Medicaid Act, any substantive right was extinguished. Before that amendment, section 1396a(a)(13)(A) (then known as the Boren Amendment) had required that Medicaid reimbursement rates be "reasonable and adequate." The Supreme Court had interpreted that language to provide operators a private right of action to enforce this obligation. *Wilder*, 496 U.S. at 509–10, 512. In 1997, Congress amended the Act to repeal the Boren Amendment and eliminate any reference to "reasonable and adequate" rates. See Pub. L. No. 105-33, § 4711, 11 Stat. 251, 507–08 (1997); H.R. Rep. No. 105-149, at 1230 (1997). The Director argued that the elimination of the reference to "reasonable and adequate" rates meant that Operators no longer enjoy any substantive rights under the Act.

Moreover, the Director contended, the Eleventh Amendment bars this suit for two reasons. First, to the extent that the Operators are really trying to enforce Illinois's state plan, she asserts that they are making an argument under the state's administrative code, which raises only a question of state law. See *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) (federal courts have no power to order state officials to comply with state law). In addition, the Director argues that the relief the Operators want, in the end, is retroactive reimbursement at the recalculated rates, and that such a payment from the state treasury cannot be compelled consistently with the Eleventh Amendment. See *Edelman v. Jordan*, 415 U.S. 651, 664, 677 (1974).

In response to the Director's first point, the Operators said that they were seeking only to enforce their procedural rights under the current statute. They urged that there is an independent value in the public process the statute affords, because without it they cannot know why the Director is refusing to treat them as new owners and failing to recalculate their rates. Armed with that information, they would be able to ask the federal Department of Health and Human Services (HHS) to force Illinois to honor its statutory obligations. The Secretary of HHS has the authority to withhold funds if a state does not act in compliance with an approved plan. See 42 U.S.C. § 1396c; 42 C.F.R. § 430.35. The information produced by an open process may also have some utility in state proceedings. Thus, they said, this is not a case of an effort to enforce an empty procedural right for its own sake; it is essentially a request for information that has concrete value. As for the Director's Eleventh Amendment point, the Operators contended that they have asked only for prospective relief with respect to their public-process claim, and that it is too early to say (despite their $12 million estimate) whether the public process would change their reimbursement rates at all. They might stay the same; they might go down; or they might go up. Only if the last of those possibilities comes to pass will the Eleventh Amendment issue be ripe to decide.

The district court denied the Director's motion. It held that *Wilder* is "alive and well," and given that fact, it saw little to discuss. It acknowledged that the language of section 1396a(a)(13)(A) has changed since *Wilder* was decided, but it found that change to be immaterial for its purposes. The new language, the court thought, also contains a clear and unambiguous right, though one that is procedural only. With respect to the Eleventh Amendment, the court essentially

agreed with the ripeness argument: it said that the suit was not barred because the Operators were alleging an ongoing violation of federal law and the relief they requested did not "necessarily" embrace money damages. It concluded that "[i]f such a possibility were to arise at a future date, it could be dealt with at that time."

The Director found this disposition a bit confusing, and so she asked the court to clarify its order denying her motion to dismiss. She contended that at least some of the Operators' requested relief is impermissible under the Eleventh Amendment, and she gave as examples (1) their request for a declaration that IDHFS violated the public-process requirement, and (2) their request for an injunction ordering the agency to establish and process appropriate reimbursement rates retroactive to July 2013. The court refused to amend its order; it repeated its conclusion that the Eleventh Amendment issue was not ripe and added that the Director was seeking an advisory opinion. The court was satisfied that the Operators were seeking at least some prospective relief within its authority to give. Nonetheless, it certified for appeal under 28 U.S.C. § 1292(b) its initial order and its order on reconsideration ruling on the question whether the current language of section 1396a(a)(13)(A) provides a private right of action enforceable under section 1983. We agreed that these orders meet the requirements for an immediate appeal, and so we accepted the case.

## II

Before going further, we say a word about what is properly before us. The Supreme Court held in *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996), that "appellate jurisdiction applies to the *order* certified to the court of appeals, and

is not tied to the particular question formulated by the district court." *Id.* at 205. In this case, we have the two related orders, both of which address the existence of a private right of action and the Eleventh Amendment. They demarcate the scope of the interlocutory appeal. On that understanding, we begin with the question whether the current version of section 1396a(a)(13)(A) creates a private right of action that can be asserted by the nursing home operators who have brought this suit.

We agree with the Director on at least one point: the district court's analysis, standing alone, fails to come to grips with the critical fact: even though the Supreme Court has never overruled its decision in *Wilder*, that decision addressed a version of the statute that is now history. But our paths diverge after that. It would be one thing if the Operators were contending that the statute somehow still contains the requirement for "reasonable and adequate" rates that existed before 1997, but they are not. They raise only the narrow question whether section 1396a(a)(13)(A), in its current form, confers on them an enforceable right to a public process. Indeed, we do not have before us even the question whether, if the statute supports such an action, this particular complaint states a claim upon which relief can be granted. The district court did not rule on the latter question, and the Director expressly stated in her moving papers in this court that she is not yet raising that issue. We have no reason to take up this question when neither party is asking us to do so and it played no part in the order under review.

The Operators are using 42 U.S.C. § 1983 in this suit as the vehicle for enforcing their alleged statutory rights. As *Blessing v. Freestone*, 520 U.S. 329 (1997), and *Maine v. Thiboutot*,

448 U.S. 1 (1980), establish, this is an appropriate use of section 1983. The Court stressed in *Blessing* that the "plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Id.* at 340. When deciding whether a qualifying right is at stake, the Court looks at three factors:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* at 340–41. One of the cases the Court cited in support of this passage was *Wilder*, 496 U.S. at 510–11. See also *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (emphasizing that nothing short of an "unambiguously conferred right" in a federal law may support an action under section 1983). Further evidence that the Court takes a strict view in these matters comes from *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384–86 & 1386 n.* (2015), where it warned that opinions after *Wilder* "plainly repudiate the ready implication of a § 1983 action" for anything short of the kind of "unambiguously conferred right" to which *Gonzaga* referred.

Even so, nothing in *Armstrong*, *Gonzaga*, or any other case we have found supports the idea that plaintiffs are now flatly forbidden in section 1983 actions to rely on a statute passed pursuant to Congress's Spending Clause powers. There would have been no need, had that been the Court's intent, to

send lower courts off on a search for "unambiguously conferred rights." A simple "no" would have sufficed.

Applying this strict test, we have found that certain parts of the Medicaid Act confer unambiguous private rights. See, *e.g.*, *Bontrager v. Ind. Family & Soc. Servs. Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (holding that section 1396a(a)(10) creates a private right of action enforceable under section 1983); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972–73 (7th Cir. 2012) (holding that section 1396a(a)(23) creates a private right of action enforceable under section 1983). In *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016), we affirmed the grant of a preliminary injunction against the state in a suit brought by Medicaid beneficiaries who were seeking to enforce section 1396a(a)(8), (43)(C), and (4)(B). The Fifth Circuit similarly ruled in *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 837 F.3d 477, 491–92 (5th Cir. 2016), that section 1396a(a)(23) supports a private right of action enforceable in a suit under section 1983.

As we already have noted, the Operators are not arguing that the current version of section 1396a(a)(13)(A) creates a substantive right to any particular level of reimbursement. Instead, they contend, it creates a procedural right to certain information, as well as a procedural right to notice and comment. The Director, not surprisingly, takes a different view. She argues that subpart (a)(13)(A) focuses on the states, not on the providers, and "does not necessarily benefit providers because the process may result in a lower payment rate." Moreover, she adds, that subpart lacks mandatory, rights-creating language.

Working our way through the criteria the Supreme Court established in *Blessing*, we begin with the question whether

section 1396a(a)(13)(A) benefits nursing home operators such as the plaintiffs. We are confident that the answer is yes. Who else would have a greater interest than the Operators in the process "for determination of rates of payment under the [state] plan for … nursing facility services"? This does not mean that the residents, vendors, and others might not also have some interest, but if Medicaid or private insurance is covering their expenses, their interest is less immediate. Through the public process required by the statute, the Operators "must" be given an opportunity to review and comment on the proposed reimbursement rates. Although the statute also alludes to the state Medicaid plan, it identifies providers as the beneficiaries of the federal law. See *Planned Parenthood of Ind., Inc.*, 699 F.3d at 974 (deciding that section 1396a(a)(23) "does not simply set an aggregate plan requirement, but instead establishes a personal right"); see also *Gean v. Hattaway*, 330 F.3d 758, 772–73 (6th Cir. 2003) (holding that section 1396a(a)(3), which states that "[a] State plan for medical assistance must provide for granting an opportunity for a fair hearing … to any individual whose claim … is denied …," benefits individuals so as to create a personal right).

*Blessing* instructs us next to ask whether the plaintiff has demonstrated that the alleged right is not so vague and amorphous that its enforcement would strain judicial competence. While vagueness and lack of definition might have been a problem when the courts in the pre-1997 era were trying to ascertain whether a proposed rate was "reasonable and adequate," they are not barriers under the current statute. It spells out exactly what the procedural requirements are for the process of rate-setting: publication of the proposed rates, methodologies used, and justifications; reasonable opportunity to comment; and publication of the final rates, methodologies,

and justifications. 42 U.S.C. § 1396a(a)(13)(A)(i)–(iii). These are garden-variety procedural rules, which courts are very good at enforcing.

Finally, the statute cannot leave any room for discretion on the part of the state: it must "unambiguously impose a binding obligation." *Blessing,* 520 U.S. at 341. Once again, section 1396a(a)(13)(A) fits the bill. The language is clear: "A State plan for medical assistance *must*" provide the public process described in the law. As the Fifth Circuit observed in *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 603 (5th Cir. 2004), "it [is] difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant [Medicaid Act] language—'A State Plan must provide'—from the 'no person shall' language of Titles VI [of the Civil Rights Act of 1964] and IX [of the Education Amendments of 1972]" to which the Supreme Court referred in *Gonzaga*. See also *Sabree v. Richman*, 367 F.3d 180, 190 (3d Cir. 2004) (finding the same mandatory character for the Medicaid Act, with respect to care facilities for the mentally disabled).

The Director pushes back against this reasoning with references to out-of-circuit cases, but none of them analyzes whether the current version of section 1396a(a)(13)(A) can be enforced by operators of nursing homes. See *N.Y. Ass'n of Homes & Servs. for the Aging, Inc. v. DeBuono*, 444 F.3d 147, 148 (2d Cir. 2006) (summarily affirming *In re NYAHSA Litig.*, 318 F. Supp. 2d 30, 37–39 (N.D.N.Y. 2004), which holds that repeal of the Boren Amendment removed party's ability to enforce any *substantive* right relating to adequacy of rates); *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 54–57 (1st Cir. 2004) (concluding that pharmacies, which unlike nursing homes are not named in the statute, do not have a right to a

public process); *HCMF Corp. v. Allen*, 238 F.3d 273, 277 (4th Cir. 2001) (concluding that there is no *substantive* right to reasonable payment rates after repeal of Boren Amendment); *Children's Seashore House v. Waldman*, 197 F.3d 654, 659 (3d Cir. 1999) (same). The only genuinely contrary decision the Director has found is from a district court in Arizona. See *Ariz. Hosp. & Healthcare Ass'n v. Betlach*, 862 F. Supp. 2d 978, 986 (D. Ariz. 2012). For the reasons we already have given, we are not persuaded by that position.

As we indicated earlier, the right to a public process, with full notice-and-comment rights, is not a meaningless one, any more than the information produced pursuant to a request under the Freedom of Information Act, 5 U.S.C. § 552, is pointless. As the Supreme Court has repeatedly reminded us, the primary way in which the Medicaid Act, along with other Spending Clause legislation, is enforced is through federal oversight and the threat of withdrawal of federal funds. Even if, as appears to be the case here, there are no formal administrative remedies within the Centers for Medicare and Medicaid Services (CMS) of HHS for beneficiaries of the Act (such as the Operators here), there is an active flow of information from providers to the agency. CMS reviews state Medicaid plans for compliance with federal requirements. See 42 U.S.C. § 1396a(b); 42 C.F.R. §§ 439.10, 430.12, 430.15. The Secretary of HHS is empowered to withhold funds if a state does not act in accordance with an approved plan. See 42 U.S.C. § 1396c; 42 C.F.R. § 430.35. Individual providers may bring information to the Secretary's attention and urge him to consider a compliance action. In addition, information gleaned from the public process required by the statute can be used in Illinois as the basis of a compliance challenge in state court, where providers could assert that the state is failing to comply with

its rate-calculation policies. See, *e.g.*, *Ill. Health Care Ass'n v. Walters*, 710 N.E. 2d 403, 407 (Ill. App. Ct. 1999); *Moehle v. Miller*, 513 N.E. 2d 612, 615 (Ill. App. Ct. 1987). These possibilities demonstrate that the procedural rights have independent value. They also show that the theory the Operators are pursuing is not just an impermissible end-run around the Eleventh Amendment.

Before turning to the Eleventh Amendment in somewhat greater detail, we address one final possibility that neither party has mentioned. Although a statute that confers an individual right is presumptively enforceable under section 1983, that presumption can be overcome if the opponent of enforcement can demonstrate that "Congress shut the door to private enforcement either expressly, through specific evidence from the statute itself, … or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under section 1983." *Gonzaga*, 536 U.S. at 284 n.4 (citations and quotation marks omitted). We have searched for door-shutting evidence before, however, and have not found it. See *Planned Parenthood of Ind., Inc.*, 699 F.3d at 974. *Armstrong* is not to the contrary. There the Court was evaluating section 1396a(a)(30)(A), a utilization review provision, and it concluded that subpart (30)(A) was not judicially administrable. In that context, it ruled that the federal government's ability to enforce the Medicaid Act by withholding funds, combined with the inability of courts to administer the utilization review process, precluded private enforcement of that particular subsection. Each part of the statute must be evaluated on its own, and, as we have explained, there are no comparable problems in administering the procedural requirements of subpart (a)(13)(A).

On to the Eleventh Amendment. We begin by acknowledging that the Eleventh Amendment may well bar some of the relief that the Operators are seeking, if the case reaches the point at which it appears that they have been underpaid. Other parts of the case, however, pose no such problems. The Operators have alleged an ongoing violation of the Medicaid Act, and at this stage their primary request is for a declaration and injunction requiring the Director now and in the future to provide the required public process in setting rates. To that extent, they are seeking the type of prospective, nonmonetary relief that is permissible. See *Edelman*, 415 U.S. at 664, 677. Indeed, the Director admits that the upshot of the public process the Operators want may be favorable to the state, if it turns out that the new rates would be lower than those IDHFS is now paying. In the short run, no monies would be drawn from the state treasury, and it is possible that the same will be true in the long run. See *McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1049–50 (7th Cir. 2013).

The Director is concerned that some of the relief requested by the Operators may run afoul of the Eleventh Amendment, but the district court has not yet ruled on those aspects of the complaint. We trust that when it does so, it will keep the admonitions of the Eleventh Amendment well in mind. At this stage, the record is too undeveloped to determine if the plaintiffs will wander into forbidden territory. We will not hesitate to call "out of bounds" any effort to obtain retrospective payment from the state. The fact that plaintiffs may have gotten too ambitious in their complaint, however, does not deprive the district court of jurisdiction over the case as a whole. It indicated several times that it realized that some aspects of the case may fall off because of the Eleventh Amendment, and that is enough for now.

### III

The principal question before us has been whether the Operators have an enforceable procedural right to the public process outlined in section 1396a(a)(13)(A). We conclude that they do, and that the Eleventh Amendment does not bar this case to the extent that it seeks prospective, procedural relief. Many questions remain for the district court to resolve, including whether this particular complaint states a claim upon which relief can be granted, whether the Director is entitled to partial summary judgment on identified parts of the case whether because of the Eleventh Amendment or for other reasons, and doubtless many others.

The orders of the district court that were certified under 28 U.S.C. § 1292(b) are AFFIRMED.